IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>ANTHONY LAURITA,<br><br>                Defendant. | 8:13CR107<br><br>MEMORANDUM AND ORDER |

      This matter is before the court on defendant Anthony Laurita's objection, Filing No. 303, to the Findings and Recommendation ("F&R") of the United States Magistrate Judge, Filing No. 295, recommending denial of his motion to suppress a statement he made to law enforcement officers on April 9, 2013, Filing No. 193. Defendant Laurita is charged with receipt and attempted receipt of child pornography and the accessing of a computer in interstate commerce with the intent to view child pornography (Count II) in violation of 18 U.S.C. §§ 2252A(a)(2), 2252A(b)(1), and 2252A(a)(5)(B). Filing No. 110, Second Superseding Indictment.

      Laurita seeks suppression of statements he made to law enforcement officers on April 9, 2013, in an interview at his place of employment. He argues that statements should be suppressed because he contends he was subjected to custodial questioning without Miranda warnings.[1] The magistrate judge found that Laurita was not in custody at the time he was questioned and recommended that the court deny the motion. Filing No. 295, F&R at 5-7.

---

[1] See Miranda v. Arizona, 384 U.S. 436, 444 (1966) (before questioning begins, a suspect in custody must be informed of the following: (1) he has the right to remain silent; (2) his statements may be used against him in a court of law; (3) he has the right to an attorney; and (4) if he cannot afford an attorney, one will be appointed).

The statutory grant of authority conferred on magistrate judges involves both dispositive and nondispositive motions. See 28 U.S.C. § 636(b)(1)(A) & (B); Gomez v. United States, 490 U.S. 858, 873-74 (1989); Fed. R. Civ. P. 72(a). With respect to dispositive motions, a magistrate judge lacks authority to do anything but make recommendations, which are subject to de novo review. United States v. Lothridge, 324 F.3d 599, 600 (8th Cir.2003); 28 U.S.C. § 636(b)(1).

The magistrate judge held an evidentiary hearing on defendant Laurita's motion to suppress on September 9, 2014. See Filing No. 291, Transcript. Under 28 U.S.C. § 636(b), the court has conducted a de novo review of those portions of the findings and recommendations to which defendant objects. United States v. Lothridge, 324 F.3d 599, 601 (8th Cir. 2003). The court has reviewed the record, including the transcript of the hearing and the exhibits.[2] Filing No. 291, Hr'g Tr.

The court generally agrees with the magistrate judge's recitation of the facts, with certain additional findings noted below, but finds error in the magistrate judge's application of the law to the facts. For the reasons stated below, the court finds the magistrate judge's recommendation should not be adopted, Laurita's objections to the magistrate's F&R should be sustained and defendant Laurita's motion to suppress should be granted.

I.  FACTS

---

[2] The exhibits include a copy of Agent Howley's FD-302 report of Laurita's September 9, 2014, interview (Ex. 101). In addition, The court took judicial notice of Laurita's Pretrial Services Report (Filing No. 142) and the search warrant for Laurita's Pennsylvania residence (Filing No. 222 - Ex. 28 at April 17-18, 2014, NIT suppression hearing; Filing No. 279 - Ex. 101 at September 9, 2014, severance hearing).

The facts are set forth in the F&R and will be repeated here only as necessary to the court's opinion. At the hearing, FBI agent Patrick Howley testified that he executed a federal search warrant on April 9, 2013 at Laurita's house in Uniontown, Pennsylvania, for evidence of child pornography. Filing No. 291, Hearing Transcript ("Hrg. Tr.") at 5. Laurita was not home, but his grandmother was at the residence. *Id.* at 6. After executing this search warrant, agent Howley and FBI computer scientist Brian King went to Laurita's place of employment (a call center located at a mall) to speak to Laurita. *Id.* at 6. Howley testified he approached the receptionist, who knew Howley, and told her that he wanted to speak to an employee. *Id.* at 6-7. She directed him around the back of the building to the Human Resources department. *Id.* at 8. When the agents arrived there, human resources personnel were expecting them, and directed them to a small conference room. *Id.* at 9. A few minutes later, someone brought Laurita to the room. *Id.* at 9-10.

Agent Howley testified that law enforcement officers introduced themselves and informed Laurita that they had executed a search warrant at his grandmother's house. *Id.* at 10. He stated that he "wanted [Laurita] to be aware so that he [would not be] blindsided when he came home," and that he apologized "for being at his place of employment as I don't want to jeopardize his job," and told Laurita that "it would only be maybe 10 or 15 minutes of his time." *Id.* He explained to Laurita that "this is what we're here for. It's Internet-related activity and viewing of–child pornography." *Id.* Agent Howley also stated he knew prior to the interview that Laurita had been involved with a woman who had two children and Howley was concerned about abuse of those

children.  *Id.* at 12, 19.  Howley testified that Laurita denied ever abusing the 2 children, but admitted that he had viewed child pornography.  *Id.* at 12-13, 33.

Howley also testified that he did not use strong-arm tactics or employ any ruses or deception, rather, he encouraged Laurita to get counseling.  *Id.* at 14-15.  He testified the encounter lasted 15 to 20 minutes at the most.  *Id.* at 10.  He testified that the purpose of the interview was to inform Laurita of the search and also to ask about the children of his prior girlfriend.  *Id.* at 19-20.  He specifically asked Laurita if he had abused the children and also questioned Laurita about bulletin boards, proxy servers, the "onion router" and computer capacity.  *Id.* at 13-14, 20, 34.  He also acknowledged that if Laurita had admitted that he had inappropriately touched the children, Howley would not have been able to arrest Laurita because he did not have jurisdiction for that offense.  *Id.* at 36.

Howley further testified that he and King had shown Laurita their official FBI credentials at the start of the interview.  *Id.* at 20.  Howley testified that King was present but did not ask any questions.  *Id.* at 31.  He also stated that King had accompanied him in case there was a technical issue "as it related to the website A, downloaded software, or installation of proxies."  *Id.* at 32.

Howley stated that the door to the conference room was closed.  *Id.* at 23, 27.  He testified he believed that he and King were seated across the table from Laurita with Laurita's back to the door.  *Id.* at 28.  Although he told Laurita to return to work at the end of the interview, Howley acknowledged implying that there would be some law enforcement follow-up to the search.  *Id.* at 24.  He also testified he told Laurita that getting counselling would be favorable in the eyes of the court.  *Id.* at 15, 23.  Agent

4

Howley also stated he had conducted interviews in the past and was aware of the need for Miranda warnings in a custodial setting. *Id.* at 25. Howley memorialized the interview in a report. *Id.* at 29-30; *see* Ex. 101.

Howley testified he did not inform Laurita that he was free to leave or tell him that he was free to ask the agents to leave. *Id*. at 30. He did not inform Laurita that he was not under arrest, but implied Laurita could return to work after the interview. *Id*. at 28. Nor did he inform Laurita that he did not have to answer the questions. *Id*. at 29. Howley conceded that Laurita was not provided Miranda warnings. *Id*. at 25.

Anthony Laurita also testified at the hearing. *Id.* at 40-48. He testified that he was 33 years old at the time of the interview and had completed two years of college. *Id.* His criminal history consisted of a conviction for possession of drug paraphernalia. *Id.* He stated that on April 9, 2013, he was employed at Teletech, which is call center. *Id.* at 40-41. He stated he was on a call with a customer when his supervisor approached him and handed him a note asking him to see the supervisor after the call. *Id.* at 41. Laurita then spoke to the supervisor who told Laurita "I'm going to need you to come with me" and led him to the closed door Human Resources area. *Id.* The supervisor left the area and he then met Howley and King, who then led him to the conference room. *Id.* Laurita testified that he sat between Howley and King, and that Howley was seated between Laurita and the door. *Id.* He stated King "was aggressive in his body language," for instance, "scoff[ing] at some things." *Id.* at 43. He testified the interview lasted approximately 20 minutes. *Id.* at 44. He also testified that Agent Howley told him something to the effect that telling the truth would be helpful to the case. *Id.* at 45.

5

He stated he was not told he was free to leave or that the discussion was voluntary in nature. *Id*. at 43. Also, he was not told he was allowed to have other people in the room with him. *Id.* He testified Howley asked about inappropriate contact with the two children within the first few minutes of the interview. *Id.* at 44. He denied contact with the children, but told Agent Howley that he had viewed child pornography and had accessed TOR sites on his computer. *Id.* at 46.

II.   LAW

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). The protection that the Fifth Amendment provides "reflects a judgment that the prosecution should not be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Doe v. United States*, 487 U.S. 201, 212 (1988) (citation and internal punctuation omitted).

"[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). When a suspect is interrogated in a custodial setting, the police must advise him of his right not

to answer questions and to have an attorney present during questioning. *Id.* at 467; United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (stating "*Miranda* accordingly requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued prior to questioning whenever a suspect is (1) interrogated (2) while in custody."); *see also* Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (reaffirming the central principle established by *Miranda* that: if the police take a suspect into custody and then ask him questions without informing him of his rights to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed, his responses cannot be introduced into evidence to establish his guilt.).

Custody determinations are mixed questions of law and fact which require careful assessment of "the entire circumstances of the particular case." *Griffin*, 922 F.2d at 1347. The clearest example of custody is when a suspect is placed under formal arrest, but, absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983) (*per curiam*); United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). Thus, a suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." *Griffin*, 922 F.2d at 1347; *see* United States v. Diaz, 736 F.3d 1143, 1148-49 (8th Cir. 2013) ("The critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way").

7

The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. *Berkemer*, 468 U.S. at 442; *Le Brun*, 363 F.3d at 723 ("the relevant inquiry is not whether any random reasonable person would have determined that he was in custody, but whether a reasonable person in the defendant's position would have considered his freedom of action restricted to the degree associated with a formal arrest."); *United States v. Sanchez*, 676 F.3d at 630-31 (8th Cir. 2012) ("The analysis depends upon a review of the totality of the circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview'"). The age, experience, education, legal training, and past experience with law enforcement are relevant factors in the custody determination. *Le Brun*, 363 F.3d at 723.

In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. *Sanchez*, 676 F.3d at 631. Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-1147 (8th Cir. 2007); *Sanchez*, 676 F.3d at 630. In addition, the place where the interrogation took place, the purpose of the

interrogation, the length of the interrogation, and other factors are also to be considered. *Griffin*, 922 F.2d at 1348.  Although reference to these factors is helpful, the factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Flores-Sandoval*, 474 F.3d at 1147.

The first *Griffin* factor, whether the suspect was told he or she was free to leave and that his or her answers were voluntary, weighs heavily in favor of a finding of no custody when officers clearly inform a suspect that she is free to leave or decline questioning.  *Sanchez*, 676 F.3d at 631; *see United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004).  The Eighth Circuit Court of Appeals has "long regarded these admonitions as weighty in the custody analysis."  *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (noting that it had "never held that a person was in custody after receiving [the admonitions]"); *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011).  "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will."  *Williams*, 760 F.3d at 814.  Advice that a suspect is not under arrest, and that his participation in questioning is voluntary, is highly probative of whether a reasonable person would feel that he may terminate the interview and leave.  *Id.*; *Czichray*, 378 F.3d at 826; *but see United States v. Lowen,* 647 F.3d 863 (8th Cir. 2011) (failure to inform the suspect that he was not under arrest was not dispositive when suspect was questioned in his own home, voluntarily acquiesced, and was not restrained or confined); *United States v. Lawson*, 563 F.3d 750, 753 (8th Cir. 2009) (finding the defendant was not in custody

because he was not restrained, was interviewed in his own home, was not physically threatened, and was interviewed for less than an hour). However, when officers inform a suspect only that he is not under arrest, and do not inform him that his answers to questioning are voluntary and he is free to leave, the first factor is less determinative and the analysis relies more on the other indicia of custody. *See United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006).

"Interviews taking place on police officers' 'home turf' are more likely to be police-dominated." *Id.* at 1139 (finding the defendant was in custody when he had been ordered by his parole officer to meet police, questioned at the police station, told he was not under arrest, but not told he was free to leave or terminate the interview or refuse to answer questions); *United States v. Aldridge*, 664 F.3d 705, 709–10, 712 (8th Cir. 2011) (an interview by two DEA officers was found to be police dominated when conducted in sheriff's department interrogation room housed in courthouse basement). In contrast, when a person is questioned on his own turf—in his home or in familiar surroundings such as his own office, the Eighth Circuit Court of Appeals has "observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Williams*, 760 F.3d at 815 (quoting *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985)); *see United States v. Perrin*, 659 F.3d at 721 (finding no custody when suspect questioned in the bedroom of his home, with the bedroom door cracked open and no physical restraint or positioning to inhibit exit); *Czichray*, 378 F.3d at 826 (finding no custody when defendant questioned in his own home); *United States v. Dockery*, 736 F.2d 1232, 1234-35 (8th Cir. 1984) (en banc) (finding no custody when employee questioned in a vacant office at

work but had initiated interview and had been informed that she did not have to answer any questions and was free to go); *United States v. Carter*, 884 F.2d 368, 371-72 (8th Cir. 1989) (suppressing statement when employee was questioned in a superior's office and was not told he was free to leave); *United States v. Rorex*, 737 F.2d 753, 756-57 (8th Cir. 1984) (finding a defendant was not in custody when suspect questioned in the familiar surroundings of his own office at his place of business).

Generally, in circumstances involving law enforcement questioning at a suspect's workplace hinge on whether the suspect was explicitly told he or she was free to leave or to terminate the interview. *See, e.g., United States v. Maldonado*, 562 Fed. App'x 859, 861 (11th Cir. 2014) (finding no custody when defendant was questioned at work based on the "powerful factor" that suspect was unambiguously advised she was free to leave); *United States v. Morgan*, 562 Fed. App'x 123, 130 (3d Cir. 2014) (finding defendant was not in custody when questioned at work—defendant had been told he was free to leave if he did not want to talk to the agents and was allowed to make a phone call); *United States v. Lazarus*, 552 Fed. App'x 892, 894 (11th Cir. 2014) (finding the defendant was not in custody during a brief interview at her office when the suspect had suggested date and time of interview); *Swain v. Thaler*, 466 Fed. App'x 393, 400 (5th Cir. 2012) (finding, on habeas corpus review, that the defendant was not in custody when interview occurred in front of his workplace and in public view—the defendant had invited the detective to come speak with him at work and the defendant was free to move around); *United States v. Burney*, 441 Fed. App'x 993, 995 (4th Cir. 2011) (finding a defendant was not in custody when she voluntarily agreed to the interview at her place of employment—the interview was of relatively short duration; the officers assured

11

her that she was a witness rather than a suspect, and was not under arrest; she was told she could leave at any time; she was not physically restrained; and the tone of the interview was cordial and non-threatening); *United States v. Malcolm*, 435 Fed. App'x, 417, 421 (6th Cir. 2011) (finding a defendant was not in custody when he was told repeatedly that he could leave and was not under arrest); *United States v. Perrin* 659 F.3d 718 (8th Cir. 2011)(the suspect was told he was free to leave).[3]

A suspect must not only be in custody, but he must be subjected to interrogation before Miranda warnings are required. *Berkemer*, 468 U.S. at 428; *Miranda*, 384 U.S. at 444; *Barker*, 467 F.3d at 628. An "interrogation occurs when a law enforcement officer engages in 'either express questioning or its functional equivalent.'" *Aldridge*, 664 F.3d at 711 (quoting *United States v. Hernandez–Mendoza*, 600 F.3d 971, 976–77 (8th Cir. 2010)). "Interrogation" refers to "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A suspect is entitled to these warnings prior to undergoing a custodial interrogation—"when an officer's interaction with the suspect is 'likely to elicit an incriminating response.'" *United States*

---

[3] In this district, courts have determined that an interview setting was noncustodial in factual circumstances that are similar to these, but with one major distinction—in the cases where the court has denied motions to suppress, the suspects were all told they were free to leave. See *United States v. Pierce*, 2014 WL 5851159, *6 (D. Neb. Nov 12, 2014) (defendant was informed he was free to leave, was told he was not under arrest, was on his own turf, and was in fact given Miranda warnings before the interview); *United States v. Vidlak,* 2013 WL 5376551, *2 (D. Neb. Sept. 25, 2013) (defendant was informed he was free to leave and did not have to talk to the investigator and was not under arrest); *United States v. Weiss*, 2011 WL 6026693, *2 (D. Neb. Nov. 15, 2011) (investigator specifically told suspect he was not under arrest and was free to leave at the onset of the interview); *United States v. Roble*, 2011 WL 6140743, *2 (D. Neb. Dec. 9, 2011) (defendant was told repeatedly he was free to leave).

*v. Wise*, 588 F.3d 531, 536 (8th Cir. 2009). (quoting *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007)). The test is "whether a reasonable objective observer" would have believed that the law enforcement officer's statements to the defendant were "reasonably likely to elicit an incriminating response." *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002); *United States v. Swift*, 623 F.3d 618, 622 (8th Cir. 2010) (stating "Interrogation" under Miranda is "express questioning," or "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response").

### III. DISCUSSION

Under the totality of the circumstances, the court finds that the magistrate judge erred in finding that the defendant was not in custody at the time he made the statements to Agent Howley on April 9, 2013. The application of the first *Griffin* factor, whether the suspect was told he was free to leave or to decline questioning, though not determinative, weighs heavily in the court's analysis in this case. It is undisputed that the defendant was not provided this admonition.

The other indicia of custody also favor a finding that the defendant was effectively "in custody" when he made the statements to Agent Howley. Laurita's freedom of movement was significantly constrained. Laurita had been escorted to the room by his superior, a supervisor. He was told that "he needed" to accompany the supervisor to the locked human resources area of the office, presumably, the same area of the office where employees might be disciplined or terminated. The officers then led him to a small conference room. The door was closed and the two law enforcement officers sat at a table with the defendant. There is no evidence that Laurita had any

13

familiarity with the room. There is also no evidence that the defendant was ever told why he was being visited by law enforcement until after he was inside the small conference room. A reasonable person in the defendant's position, as an employee having been instructed to participate in the interview by his supervisor, would not have felt free to leave or terminate the interview until the officers advised him that he was free to leave.

Also, Laurita did not initiate the encounter with law enforcement. The contact was initiated by the officers and effectuated with the help of the defendant's employer. Laurita's conduct reveals little more than an absence of resistance.

Notwithstanding his testimony, the court finds Agent Howley used a ruse or deceptive stratagem. The agent's stated purpose for conducting the interview was to alert the defendant to the search and seizure of the computer and to determine whether the defendant had assaulted a child. The agent knew and acknowledged that he had no jurisdiction to arrest or charge the defendant for child abuse. The agent also would have known that if the defendant knew there was child pornography on the computer, then the defendant would understand why the agent was inquiring about child abuse. By disclosing that he had seized the computer and simultaneously accusing the defendant of the heinous crime of child sexual assault, the agent would have known the accusations would likely lead the defendant to acknowledge the receipt of child pornography—a generally perceived lesser crime, but deny child molestation—perceived as a more serious offense. As evidenced by the defendant's resultant admissions, such an interrogation technique is effective when used by law enforcement

and skilled cross examiners. The agent also implied that answering the questions would operate to benefit Laurita in the potential proceedings.

Agent Howley was aware that his questions were reasonably likely to elicit an incriminating response, and a reasonable objective observer would know the questions were likely to elicit an incriminating response, following, as they did, the search of the defendant's home and the seizure of his computer. Furthermore, during the interview, Agent Howley posed specific inquiries about Laurita's computer and internet activities. Although he was informed at the outset of the interview that the meeting would only take a short time, no reasonable person accused of child molestation would believe that he would be free to go if he were to admit to child sexual abuse. In other words, a reasonable person would assume from the outset, no matter what representations were made, that the length of the encounter and the result of the encounter (potential arrest) were to be determined by the his answers to the officers' questions. The officers knew they lacked jurisdiction to arrest the defendant for a state-law child abuse crime, but Laurita, or a reasonable person in his position, would not have known that. Most importantly, Laurita was never informed he was free to leave, could terminate the interview, or could talk to an attorney.

Although the atmosphere probably could not be characterized as "police-dominated," the defendant was outnumbered, official credentials were shown to him, he had been ordered to the interview by a superior, and the conversation occurred in a closed room with the apparent approval of that supervisor. Under these circumstances, a reasonable person would not have felt free to leave or to terminate the interview. The location of the interview, occurring as it did in the middle of the workday at the behest of

15

a supervisor, was closer to law enforcement "home turf" than to a place where the defendant would feel comfortable or in control. The fact that Laurita was effectively summoned to the interview by his supervisor also tips the balance in favor of custody, a reasonable person in Laurita's position would have been reluctant to refuse the interview or terminate it once it began.

Although he was not arrested at the end of the interview, Agent Howley strongly intimated that there would be criminal repercussions of the search. Under these circumstances, Laurita's interrogation was custodial and he was entitled to be informed of his right to remain silent and to consult an attorney. Accordingly, the court finds defendant Laurita's motion to suppress the statement he made to law enforcement officers on April 9, 2013, at his place of employment should be granted.

IT IS ORDERED that

1. Defendant Laurita's objection (Filing No. 303) is sustained.

2. The court will not adopt the Findings and Recommendation ("F&R") of the United States Magistrate Judge (Filing No. 295).

3. Defendant Laurita's motion to suppress (Filing No. 193) is granted.

Dated this 16th day of December, 2014

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge